UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| THOMAS CARTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 1:04-cv-0854-JDT-TAB |
| vs. | ) | |
| | ) | |
| CITIZENS GAS & COKE UTILITY, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION
ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**[1]

**I.      Introduction.**

After Citizens Gas & Coke Utility ("Citizens") terminated Thomas Carter in March 2005,

he filed this action claiming that Citizens discriminated against him on the basis of his gender

and race (African-American) and retaliated against him in violation of Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) *et seq.*[2]  Carter claims that Citizens

discriminated against him on the basis of his gender and race when it initially denied him a full-

time position and treated him less favorably than other similarly situated non African-American

or female employees in the terms and conditions of his employment.  He further contends that

---

[1] This entry is a matter of public record and will be made available on the Court's web site.
However, the Court does not consider the issues addressed in this entry sufficiently novel to
justify commercial publication.

[2] Carter's original and amended complaint contained a sexual harassment claim that the Court
subsequently dismissed from this action because such claim is beyond the scope of Carter's
discrimination charges filed with the Equal Employment Opportunity Commission.  [See Docket
Nos. 40, 43.]  Consequently, for the purposes of this motion, the Court disregards any argument
or factual contentions that relate to that theory of liability.

Citizens denied him promotion, allowed him to be harassed, and disciplined and terminated his employment because of his race, gender, and because he complained of alleged discriminatory treatment.

Citizens filed this motion arguing that Carter cannot establish a prima facie showing of discrimination or retaliation.  Even if he could, Citizens asserts that it has legitimate work-related reasons for its actions that Carter cannot show are pretext.  As explained in more detail below, viewing the evidence in a light most favorable to Carter, none of Carter's evidence sufficiently overcomes Citizens' motion.  Consequently, the Magistrate Judge recommends that Citizens' motion for summary judgment [Docket No. 47] be GRANTED in all respects.

## II.    Summary Judgment Standard.

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The Court must construe all facts and draw all reasonable inferences in a light most favorable to the non-moving party.  *Davis v. Conway Transp. Central Express, Inc*., 368 F.3d 776, 779 (7th Cir. 2004).  "Summary judgment is inappropriate when alternate inferences can be drawn from the available evidence."  *Spiegla v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004).  While disputes over outcome determinative facts will defeat a motion for summary, disputes over irrelevant or unnecessary facts will not.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Employment discrimination cases are inherently fact-intensive, but the court is not required to 'scour the record' in an effort to assist the plaintiff in avoiding summary judgment."

*Goodum v. White*, 2006 WL 566469, at *13 (N.D. Ill. March 3, 2006) (*quoting Greer v. Board of Ed. of City of Chicago*, 267 F.3d 723 (7th Cir. 2001)).  "Because the purpose of summary judgment is to isolate and dispose of factually unsupported claims," Carter cannot successfully oppose a motion for summary judgment by relying on unsupported allegations in his complaint. *Michael v. St. Joseph County*, 259 F.3d 842, 845 (7th Cir. 2001) (*citing* Fed. R. Civ. P. 56(e)). Rather, he "must respond to [Citizens'] motion with evidence setting forth specific facts showing that there is a genuine issue for trial." *Id*.  A scintilla of evidence in support of Carter's position is not sufficient to defeat a summary judgment motion; "there must be evidence on which the jury could reasonably find" for Carter.  *Anderson*, 477 U.S. at 252.

## III.    Background.[3]

### A.    Citizens' hiring process.

Citizens hired Carter as a part-time customer service representative ("CSR") in its customer relations department on February 24, 2003.  [Carter Dep. p. 42.]  As a CSR, Carter fielded service-and bill-related complaints and issues from customers both in person and by telephone.  [Tamiko Razika Aff. ¶ 5.]  The major job criteria for CSRs are an understanding of Citizens' policies, tact, and patience.  [*Id*.]

At the time it hired Carter, Citizens filled five full-time CSR and two part-time CSR vacancies.  [Razika Aff. ¶ 6.]  Citizens first offered the full-time positions to three qualified part-time employees, one of whom declined.  [*Id*.]  Consequently, Citizens next offered the three

---

[3] The facts are either undisputed or viewed in a light most favorable to Carter, the non-moving party.

remaining full-time positions and two part-time positions to external candidates.  [Razika Aff. ¶ 7.]

Candidate selection for the remaining positions entailed three steps.  Citizens: (1) required the candidates to pass a work competency assessment ("WCA") test; (2) screened the successful WCA applicants by telephone to ascertain how they conducted themselves over the telephone; and (3) conducted face-to-face behavioral interview sessions with each remaining candidate selected after telephone screening.  [*Id*.]

The administrative assistant to Citizens' customer relations manager Carol Ann Clawson-Bucksot scheduled interviews based on candidate and interviewer availability.  [Razika Supp. Aff. ¶ 4.]  Prior to the interviews, Razika, Citizens' employment supervisor, was the only person who had knowledge of any candidate's race.  [*Id*.]  Panda Cable, a Caucasian-female customer relations scheduling supervisor, usually participated in CSR interviews.  [*Id*.]  However, on January 7, 2003, Cable was ill and absent from work so Citizens solicited other supervisors to participate in the interview process.  [*Id*., Ex. A.]  Citizens did not provide the interviewing supervisors with a predetermined number of positions to fill for the hiring process related to Carter.  [Felisa Cockrell Aff. ¶ 12.]  Customer relations supervisor Randy Rollins constantly monitored, assessed, and adjusted CSR staffing needs through the hiring process.  [Cable Aff. ¶ 3.]  Accordingly, the number of open positions for any particular shift fluctuated.  [*Id*. at ¶ 7.]

During the interview process, the interviewing supervisors recorded their impressions on a separate sheet for each candidate.  [Razika Aff., Ex. A.]  The interviewers gave each candidate two separate scores -- one for the interview and one for "skills set" derived from information evident from each candidates' application or resume.  [Razika Supp. Aff. ¶ 7; Lisa Halsworth

Supp. Aff. ¶ 6.]  Citizens ranked the candidates based upon a composite score that consisted of the average of their combined interview scores and weighted skill set scores.  [Razika Aff., Ex. A; Supp. Aff. ¶ 7.]

On January 7, four people -- Razika (an African-American female); Cockrell (an African-American female); Randy Rollins (a Caucasian male); and Clawson-Bucksot (a Caucasian female) -- interviewed Carter.  [Razika Aff., Ex. A; Carter Dep. p. 30.]  Razika worked in the human resources ("HR") department, and the other three individuals were supervisors in the customer service department.  [Carter Dep. pp. 29-30.]  Clawson-Bucksot asked Carter whether he liked to be called Thomas or Tommy.  [Razika Supp. Aff. ¶ 5.]  She wrote "Tommy" at the top of her interview sheet for Carter.  [Razika Aff., Ex. B.]

Clawson-Bucksot interviewed three candidates, and Rollins interviewed four.  [Razika Aff., Ex. A.].[4]  Razika interviewed twelve candidates, and Cockrell interviewed each of the twenty-seven final candidates.  [*Id.*]  Of the seven candidates interviewed by Rollins and Clawson-Bucksot, only Carter ultimately obtained employment.  [*Id.*]  Citizens offered two candidates interviewed by Razika part-time positions -- Carter and Mary Ann Young.  Young's composite score (3.3) was lower than Carter's (3.88).  [*Id.*]

Carter ranked highest among all candidates in coping and handling problematic workplace situations.  [Cockrell Aff. ¶ 10.]  Cockrell believes that Carter "ranked the highest in his verbal communication skills of all the applicants that were selected," that his "overall

_____

[4] In its reply brief, Citizens cites to Razika's affidavit Exhibit A in support of its representation of these individuals' respective races (Klaiber -Caucasian female; Eastman - Caucasian female; Hutchins - African-American female; and Cooper - Asian female).  An examination of Exhibit A, however, reveals no such evidence.  Thus, consistent with Rule 56, the Court may not consider these racial designations.

interview scores ranked highest of all the applicants" and that the supervisors  "selected Thomas for the new training class as a full-time CSR."  [*Id*. at ¶¶ 8, 11.]  The interviewing supervisors submitted their interview sheets to Citizens' HR department.  [*Id*. at 8.]

HR extended offers to fill the positions in order of composite scoring.  [Cable Aff. ¶¶ 6-7.]  Three candidates -- two African American females and one Caucasian female -- who had higher composite scores than Carter (Ta-Tasha Warfield (4.38), Stephanie Russell (4.36) and Angie Moody (3.99)) accepted full time positions.  [Razika Aff., Ex. A.]  Cockrell, Cable, and Daniel Robinson interviewed these successful full-time candidates.  [*Id*.]

Upon completion of the interview process, Cable offered Carter a part-time position with an 8:00 a.m. to 2:00 p.m. shift.  [Carter Dep. pp. 33-34.]  Cable told Carter that no new hires would be hired into full-time positions.  [*Id*. at 33.]  Approximately four days later, Cable called Carter again regarding working hours and informed him that the correct shift was from 2:00 p.m. to 8:00 p.m. if he still wanted the part-time job.[5]  [Carter Dep. at 34.]

Sometime between Carter's February 24 hire date and April 2003, Carter spoke with HR director Kimberly Hackett and Razika about his concern that the hiring decision was unfair.  [Carter Dep. pp. 41-52.]  On May 5, 2003, Oaks sent Carter an e-mail stating:

---

[5] Carter testified that Cable also offered another external candidate who scored lower than Carter, Mary Ann Young, a full-time position.  [Carter Supp. Aff. ¶ 5.]  Citizens objects that Carter's representation of what Young told him about Cable's offer is hearsay.  [Docket No. 74, p. 1.]  However, any statement by Cable to Young regarding a job offer is not hearsay consistent with Rule 801(d)(2)(D).  Nevertheless, Carter has no personal knowledge of the conversation between Young and Cable, and Young denies that Cable offered her a full-time position.  Because Carter has only his self-serving supplemental affidavit to support the rebutted conversation between Young and Cable, this evidence is not properly admissible.  *See Adams v. Wal Mart Stores, Inc*., 324 F.3d 935, 940 (7th Cir. 2003) (the court deemed "conclusory assertions about incidents outside [employee's] personal knowledge" insufficient evidence of race discrimination).

"We are in receipt of your resume for a full-time CSR position.  Since you interviewed for a CSR position within the last year it is your option to either interview again or not.  If not, we will use your interview from when you were hired.  Please advise ASAP."

[Carter Dep. p. 113, Ex. 6.]  Carter replied to Oaks' e-mail:

"Thanks for the opportunity to interview again.  At this point I'd rather not re-interview.  I'd like to use my interview from when I was hired."

[*Id.*]  Citizens promoted Carter to full-time status effective May 15, 2003 without requiring him

to re-interview.  [Razika Dep. p. 13; Carter Dep. p. 112.]

### B.    Relevant Citizens policies.

Carter received a copy of Citizens' employee handbook on February 24, 2003.  [Carter

Dep. p. 122, Ex. 7.]  The employee handbook contains information pertaining to "Commitment

to Diversity" and "Attendance."  [*Id.*]  The employee handbook section on "Attendance" states:

"Consistent attendance and punctuality are work habits that the Utility requires supervisors to consider when they evaluate an employee's work performance.  When an unforeseen event arises that requires an employee to miss work or be late in arriving to work, the employee must promptly report the situation to the supervisor.  An employee should make every effort to report absence or lateness to the supervisor no later than the employee's starting time.  If the employee's supervisor is not available, the employee must leave a message for the supervisor that includes the reason for the absence or lateness and the date the employee expects to return to work.  Permission to be absent or late is not automatically granted to the employee when the employee calls….  Failure to maintain a satisfactory attendance record may result in disciplinary action up to and including termination…."

[Carter Dep. p. 122, Ex. 8.]

### C.    Promotions.

Employees in the customer service department can be "promoted" through either

"developmental assignments" -- employees apply for developmental assignments in order to be

trained in another area of Citizens' operations -- or through the job posting system that allows

7

employees to apply for posted job openings.  [Razika Aff. ¶¶ 20-21.]  Carter has never applied

for any developmental assignments.  [*Id*.]  Carter applied for two sales positions in April and

May 2003.  [*Id*., Ex. H.]  Citizens withdrew these positions without filling them.  [Razika Aff.

¶ 21.]  In May, 2003 Carter applied for a full-time CSR position, which Citizens awarded him.

[*Id*.]  Carter did not apply for any positions after May 2003.  [*Id*.]

On August 23, 2004, Citizens changed Carter's title from CSR to "CAS Tier 2

Associate" and increased his annual salary from $27,881 to $28,392.  [Carter Dep. pp. 269-70,

Ex. 40.]  Carter declined training for a CAS Tier 3 position on October 6.  [Carter Dep. p. 283,

Ex. 41.]  Moving from a CAS Tier 2 to CAS Tier 3 position would have been a promotion.

[Halsworth Aff. ¶ 9.]

### D.   Carter's relevant history with Citizens.

Dennis Claffey, a customer service learning facilitator, was addressing Carter's newly

hired CSR class during training, when he said: "if you have a problem being here, if you don't

like something about being here, we'll find a place for you out the doors."  [Carter Dep. pp. 102-

05; Claffey Aff. ¶ 2.]  Claffey looked at Carter when he made that comment, and Carter felt it

was directed to him.  [Carter Dep. pp. 102-05.]

On another occasion during CSR training, Rhonda Harper, an African-American who

was a team leader in customer relations at the time, verbally warned Carter, who was wearing

business slacks and a button down shirt, that his attire was "slacking."  [Carter Dep. pp. 105-08;

Carter Aff. ¶¶ 9-10; Harper Aff. ¶ 4.]  Citizens did not formally discipline Carter because of

Harper's concerns about his work attire.  [Harper Aff. ¶ 7.]

Within one month of hiring Carter, Citizens coached him on March 21, 2003 regarding his failure to pay attention and for leaving the room excessively during training.  [Carter Dep. pp. 203-04, Ex. 16.]  Citizens placed Carter on a performance improvement plan ("PIP").  In October 2003, Carter began arriving late to work.  On October 28, Citizens discussed the customer service attendance requirements with Carter and gave him a copy for his own personal reference.  [Carter Dep. pp. 306-07, Exs. 47, 48.]  Carter acknowledged that he understood and would comply with these requirements.  [*Id.*]

Earlier in October, Carter participated in a customary ride with a field collector, Mike Dillon.  [Razika Aff. ¶ 15; Carter Dep. pp. 118-19.]  While on the routine field trip, Dillon showed Carter an older neighborhood.  At one point Dillon stopped at a home and said to Carter, "You know, you're going to be offended by this"..."this is the home of the grand dragon of the Ku Klux Klan here."  [Carter Dep. pp. 118-19.]

On November 20, Harper counseled Carter about two customer complaints.  [Harper Aff. ¶¶ 1, 8, Ex. A; Carter Dep. Ex. 18.]  The first complaint came from a customer who called to complain about how Carter treated the customer's sister when she called Citizens on November 17, 2003.  [*Id.*]  Harper explained that "the customers' perception that he was rude is their reality even if he didn't intend to be."  [Harper Aff. ¶ 8, Ex. A.]  Harper instructed Carter how to better handle this situation in the future.  [*Id.*]  The second complaint followed Carter's refusal to allow a customer to speak with a manager after the customer requested a manager.  [*Id.*]  Harper told Carter not to refuse the customer's request.  Citizens did not discipline Carter for either complaint.  [*Id.*]

On November 25, Carter filed his first charge with the EEOC.  [2nd Am. Compl., Ex. A.] He asserted that Citizens discriminated against him on the basis of his race and gender when it initially failed to hire him full-time and did not adequately resolve his complaint regarding the field collector's experience.  [*Id.*]

On December 3, 2003, Carter's supervisor, Rollins, coached Carter concerning his tardiness.  [Carter Dep. pp. 206-07, Ex. 17.]  CSRs are expected to be signed on and available for calls at the beginning of the scheduled shift each day.  [*Id.*]  The policy also permits no more than two arrive late/leave early incidents per quarter.  [*Id.*]  Rollins placed Carter on a second PIP, and he noted that Carter had arrived late three times during the quarter beginning October 1, 2003.[6]  [*Id.*]  Rollins warned Carter that failure to correct his timeliness could result in a verbal warning.  [*Id.*]

On December 24, Rollins issued Carter a written warning for excessive unscheduled absences and placed him on a third PIP.  [Carter Dep. pp. 211-12, Ex. 19.]  Citizens' attendance policy allowed employees to incur up to ten unscheduled absences in a twelve-month rolling year without discipline.  [Carter Dep. Ex. 19.]  In response to Carter's concern that Rollins had included dates not properly considered for purposes of unscheduled leave, Rollins amended the PIP to exclude one date.  [Carter Dep. Exs. 20-21.]  Between May 7 and December 27, Carter amassed eleven unscheduled absences and was late to work again on December 27.  [*Id.*]  Thus, Citizens' December 31 amended third PIP did not lessen the disciplinary action received by

_____

[6] On October 15, Carter called to report he was running late and logged in twenty-three minutes late.  Carter called in with a flat tire and logged in thirty-five minutes late on November 20.  On November 29, Carter arrived for his shift thirty-two minutes late.  [Carter Dep. Ex. 17.]

Carter.  [*Id*.]  At the end of January 2004 Carter received his annual evaluation for the calendar year ending December 31, 2003.  [Carter Dep. Ex. 44.]  Carter's supervisor rated him only "partially successful in meeting requirements" because of his tardiness and absenteeism problems.  [Carter Dep. pp. 291-92, Ex. 44.]

On March 20, 2004 Rollins issued Carter his fourth PIP and second written warning due to improper conduct with a customer.  [Carter Dep. pp. 214-16, Ex. 22.]  Rollins noted that a customer called on March 19 to complain about a contact she had with Carter earlier that day. [Carter Dep. Ex. 22.]  Rather than provide information on assistance, Carter lectured the customer on how she might put her children in day care, go back to school, and find work. [Carter Dep. Exs. 22, 26; Halsworth Aff. ¶ 8, Ex B.]  Citizens believed Carter showed a lack of respect, a condescending attitude toward the customer, and was not responsive to the customer's needs.  [*Id*.]

In April 2004, the customer service department surveyed the time CSRs spent away from their desks during scheduled shifts.  [*Id*.]  The results indicated that CSR average time away from desks, excluding break and lunch, was eight minutes and thirty-two seconds per shift.  [*Id*.] In contrast, Carter was away from his desk twenty-two minutes and fifty-four seconds per shift -- the greatest average time away for any CSR.  [*Id*.]  Citizens counseled all CSRs with time away from their desk greater than the average.  [*Id*.]  Carter received the same counseling as all other employees above the average time away from the desk.  [*Id*.]

On April 13, 2004, Carter was getting up to get a drink of water and Tawna Hadden, a Caucasian female, customer service team leader said to Carter: "sit your black ass down." [Carter Dep. pp. 172-77; Halsworth Aff. ¶ 13.]  This was not the first such verbal exchange

11

between Hadden and Carter.  Carter contends that she: called him "boy" on multiple occasions [Carter Dep. pp. 168, 193; Carter Aff. ¶ 25]; on at least one occasion, called him a "nappy head boy" [Carter Dep. p. 194]; referred to the area where Carter's desk was located as "the hood" [*Id*. p. 169]; and on another occasion, said: "get your butt back in your seat, Boy" when Carter was leaving his desk [*Id*. at p. 171].

Rollins prepared a fifth PIP for Carter on April 29 concerning another phone call with a customer.  [Carter Dep. p. 218, Ex. 24.]  Rollins documented that a customer called on April 22 to complain about a contact she had with Carter earlier that day.  [Carter Dep. Exs. 24, 25; Halsworth Aff ¶ 8, Ex. B.]  Citizens determined that Carter showed a lack of respect and a condescending attitude toward the customer.  [*Id*.]  During the conversation the customer said she was unemployed, but that she would pay a portion of the bill.  [*Id*.]  Carter asked her how she was going to pay if she was not working.  [*Id*.]  Carter falsely stated that it was part of Citizens' general procedure when the customer asked Carter why he needed to know.  [*Id*.]  Rollins noted this was the second complaint of this type within thirty days.  [Carter Dep. Ex. 24.]

Citizens determined that during the March 19 and April 22 calls, Carter demonstrated a lack of respect toward unemployed, payment-troubled customers.  [*Id*.]  On May 4, Rollins and Liz Yedla, Carter's team leader, presented the fifth PIP to Carter and he was suspended for a day.  [Carter Dep. pp. 222-23, Ex. 27.]  Carter agreed he needed to improve.  [*Id*.]  Rollins further discussed Carter's excessive unproductive work time ("time away from desk").  [*Id*.]  Rollins advised Carter that as part of his improvement, his amount of unproductive work was not to exceed the peer average for unproductive work.  [*Id*.]

During the May 4 meeting with Rollins and Yedla, Carter complained that he still had not received cashier's training and interview training.  [Carter Dep. p. 223.]  Carter also requested training in the areas of interview, reception, and switchboard.  [Carter Dep. p. 271.]  Carter received training as a cashier in the customer service department in approximately August or September of 2004.  [Carter Dep. pp. 270-71.]

On May 14, 2004 Carter filed his second charge with the EEOC.  [Carter 2nd Am. Comp., Ex. C.]  He alleged that Citizens failed to act on his reports of derogatory name calling and harassed him with unjustified discipline.  He further alleged that Citizens failed to provide any reason for his lack of promotion.  [*Id.*]

Carter was on medical leave from approximately June 14 through August 10.  [Carter Dep. Ex. 29.]  During his leave, Lisa Halsworth and Yvette Grondin called Carter about the necessary medical documentation.  [Carter Dep. p. 199.]  Carter felt harassed because two people were on the phone and "they completely poured salt on the wounds by basically tag-teaming [him] and giving [him] this onslaught of information that [he] needed to have turned in and letting [him] know all of these deadlines that were getting ready to pass."  [*Id.* at p. 200.]  While Carter was on leave, Rollins sent Carter a letter dated August 6, 2004, asking Carter to contact a supervisor to discuss his schedule no later than August 11, 2004 and informing Carter that failure to respond would be considered a resignation.  [Carter Dep. pp. 224-25, Ex. 28.]

In its December 31, 2003, written warning to Carter regarding attendance, Citizens had warned him that an additional PIP would be issued for continued unscheduled absences during the rolling twelve months from the first unscheduled absence date.  By August 10, 2004, Carter

13

had accumulated thirteen unscheduled absences[7] and on August 11, Rollins prepared an updated PIP regarding Carter's absenteeism. [Carter Dep. p. 230, Ex. 29.] As part of the updated PIP regarding attendance issues, Citizens instructed Carter to: (1) communicate directly with Rollins, Harper, Vicki Hughes, or Mike Pirone about all future unscheduled time off; (2) request time off a week in advance; and (3) comply with other requirements consistent with the attendance policy. [Carter Dep. Ex. 29.] Citizens also noted that Carter was required to comply with the May 4 PIP regarding the inappropriate customer contact. [*Id.*][8]

On November 15, Rollins prepared a last chance agreement ("LCA") for Carter. [Carter Dep. p. 231, Ex. 30.] Rollins noted that on October 15, he reiterated Citizens' requirement that Carter notify a supervisor in the case of an unscheduled absence. Rollins further documented that Carter arrived late for work on October 22 without notifying a supervisor. Carter admits that he was late on October 22 and failed to call in and report that he would be late. [Carter Dep. p. 238.] The LCA outlined job performance requirements Carter would need to meet in order to retain his employment, including: no more than ten unscheduled absences during a twelve month rolling year; no more than two late arrivals and/or leave early per quarter; be signed on and available for calls at the beginning of the scheduled shift each day; adhere to break and lunch schedules; all future unscheduled time off to be communicated directly to his supervisor

---

[7] Carter incurred unscheduled absences in 2003 on June 10, July 18 and 28, August 15, October 4, December 18, 19, 22, and 27, and in 2004 on January 31, and June 9, 10, and 11. Citizens did not count Carter's FMLA leave between June 14 and August 10, 2004 as absences.

[8] On September 8, Rollins advised Carter that his updated plan had been amended to exclude additional days covered by the FMLA and a day he missed due to confusion about his schedule. [Carter Dep. p. 234, Ex. 31.]

14

(Rollins), or in his absence, Harper or Hughes; no planned time off without one week's notice;

any schedule discrepancies to be communicated directly to his direct supervisor (Rollins), or in

his absence, Harper or Hughes; and adhere to customer contact standards, including: demonstrate

respect, concern, and caring; using appropriate attitude/tone with customers; and practice active

listening skills.  [*Id*.]

On March 10, 2005, Rollins spoke to Carter about his time "away from desk" that

occurred within eight minutes after arriving for his shift.  [Carter Dep. pp. 247-48, Ex. 32.]  On

March 11, Rollins and Claffey met with Carter to discuss his LCA.  They believed that Carter

had violated multiple provisions, such as not being signed in and available for calls at the

beginning of his scheduled shift, not adhering to break and lunch schedules, not communicating

unscheduled absences and schedule discrepancies directly to his supervisor, and not sending e-

mail communication of schedule discrepancies to his supervisor.  [Carter Dep. p. 252, Ex. 33.]

Claffey informed Carter that normally they would now be at the termination stage, but that they

wanted Carter to be successful and meet the requirements of his agreement.  [Carter Dep. Ex.

33.]  Claffey advised Carter that any further violations would result in termination.  [*Id*.]

On Saturday, March 19 Carter handled a call in which a customer asked to speak with a

supervisor.  [Halsworth Aff. ¶ 10, Ex. C.]  Carter tried to prevent the customer from speaking

with a supervisor.  [*Id*.]  Supervisor Vicki Hughes reviewed the March 19 call after being

contacted by the customer.  [Carter Dep. Ex. 34.]  On March 21 Rollins and Hughes met with

Carter about the March 19 call and about Carter being away from his desk for thirty minutes

beyond his regularly scheduled lunch and two scheduled breaks that same day.  [*Id*.]  Carter

could not remember why he was away from his desk that day but believed it was possible a

computer malfunction erroneously marked him away from his desk.  [Carter Dep. pp. 260-61, Ex. 34; Carter Aff. ¶ 28.]

Hughes and Rollins asked Carter to listen to the customer call, and advised him that it was not a good customer interaction.  [Carter Dep. Ex. 34.]  They told Carter that the call should have automatically been transferred up to the next tier.  [*Id.*]  In response, Carter stated, "sorry about the call.  Honestly, I had a rough Saturday.  I was not intending to be rude.  It was not only that call that was not so good."  [*Id.*]  The meeting ended, and Citizens sent Carter home for the rest of the day as a disciplinary day off.  [Carter Dep. pp. 260-61, Ex. 34.]  Carter agrees the March 19, customer "contact was a less than favorable contact."  [Carter Dep. p. 339.]

On March 22 Claffey and Rollins met with Carter and advised him that the March 19 call violated the LCA and that his employment was terminated.  [Carter Dep. p. 26, Ex. 36.]

## IV.    Discussion.

Carter contends that Citizens discriminated against him on the basis of his race and gender when it: (1) hired him part instead of full-time; (2) subjected him to derogatory remarks; (3) scrutinized him more closely than his peers; (4) gave him undesirable assignments; and

(5) disciplined him.  [Carter 2nd Am. Compl. ¶¶ 8-25.][9]  Carter asserts that Citizens retaliated against him for complaining about discrimination to management and the EEOC when it: (1) denied him promotions; (2) subjected him to harassment; and (3) disciplined him and terminated his employment.  [*Id*. at ¶¶ 28-34.]

Universally understood, Title VII forbids an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... race or sex" or because an individual complained about discrimination.  42 U.S.C. § 2000 *et seq*.  An employee who believes he has been discriminated against on these bases or retaliated against for engaging in protected activity has two evidentiary methods -- direct or indirect -- available to defeat a summary judgment motion.  *Volovsek v. Wisconsin Dept. of Ag., Trade and Consumer Protection*, 344 F.3d 688, 689 (7th Cir. 2003).

### A.    Discrimination or retaliation through the direct method.

An employee trying to prove Title VII discrimination or retaliation via the direct method may do so with either direct evidence or circumstantial evidence.  *Davis v. Con-way Transp. Cen. Ex. Inc.*, 368 F.3d 776, 786 (7th Cir. 2004).  "Direct evidence is evidence, which, if believed by the finder of fact, 'will prove the particular fact in question without reliance upon inference or

---

[9] Carter seems ambivalent regarding the basis -- race, gender, or both -- for his discrimination claims.  [See Docket No. 62, pp. 3, 6, 12, and 13.]  So much so, that Citizens contends that Carter's failure to hire claim is only gender based and any claim for race discrimination is "beyond the scope" of Carter's EEOC Complaint.  [Docket No. 74, pp. 32-33.]  Upon examination of Carter's pleadings and related filings, the Court disagrees.  Despite Carter's confused briefing in this regard, the Court finds that Carter, more than not, asserts that Citizens failed to hire him for a full-time position due to both his race and gender.  He checked "race" on his November 25, 2003 EEOC form.  Even if he had not, a claim for race discrimination is "like or reasonably related" to his EEOC charge, and can be reasonably expected to grow out of an EEOC investigation of the charge he filed.  *Sitar v. Indiana Dept. of Transp.*, 344 F.3d 720, 726 (7th Cir. 2003).

presumption.'" *Volovsek*, 344 F.3d at 688 (*citing Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir.1997)).  Direct evidence is tantamount to an admission by the decision maker that an employment action was taken for an improper reason.  *Rudin v. Lincoln Land Community College*, 420 F.3d 712, 719 (7th Cir. 2005) (*quoting Sheehan v Daily Racing Form, Inc.*, 104 F. 3d 940 (7th Cir. 1997)).  Carter proffers no such evidence.

To prevail under the direct method using circumstantial evidence, Carter may avoid summary judgment only if he presents "circumstantial evidence which provides a 'convincing mosaic of discrimination,' *Troupe v. May Department Stores Company*, 20 F.3d 734, 737 (7th Cir. 1994), from which a jury may reasonably infer intentional discrimination."  *EEOC v. Continental Airlines*, 2006 WL 14510, at *6-7 (N.D. Ill. Jan. 3, 2006) (*citing also Volovsek*, 344 F.3d at 689).  This more common type of evidence "allows a jury to infer intentional discrimination or retaliation" and "comes generally in three flavors:  (1) suspicious timing, ambiguous statements, behavior towards other employees and so on; (2) evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently, or (3) evidence that a qualified employee was passed over or an employee was meeting the employer's legitimate expectations and suffered an adverse job action, and the employer's reason for the difference in treatment is a pretext for discrimination."  *Volovsek*, 344 F.3d at 689-90 (*citing Troupe*, 20 F.3d at 736).  "The three forms of circumstantial evidence can be used independently or in the aggregate to 'provide a basis for drawing an inference of intentional discrimination.'"  *Continental Airlines*, 2006 WL 14510, at *6-7 (*quoting Troupe*, 20 F.3d at 736).

Carter's arguments are convoluted.  One telling example of this shortcoming is that two pages of his brief remain missing.  The Court notified Carter of this error and stated, "Plaintiff would be well advised to promptly seek leave to correct this omission."  [Docket No. 73, p. 2 at n.1.]  Carter took no action to correct this deficiency.  Nevertheless, it appears that Carter may contend that he can prove discriminatory intent through a "mosaic of circumstantial evidence." [Docket No. 62, pp. 12-13.]  For those parties who, under the guise of Rule 56 briefing, lead a court to wade through their evidentiary bog, a quick reminder is in order: "A judge is the impartial umpire of legal battles, not a plaintiffs' attorney.  He is neither required to hunt down arguments plaintiffs keep camouflaged ... nor required to address perfunctory and undeveloped arguments," and "[a] plaintiff's recital of the facts of the case triggers no duty on the part of the judge to research, construct, and further research the best legal arguments he can for that fact-reciting party."  *Williams v. Eastside Lumberyard and Supply Co.*, 190 F. Supp. 2d 1104, 1114 (S.D. Ill. 2001)).

With that said, Carter's designated evidence largely relates to perceived slights and unpleasant encounters with coworkers or supervisors who had no significant decision making authority with respect to any materially adverse employment action against Carter. Consequently, his evidence does not further his intent to employ a direct method.  *See Davis,* 368 F.3d at 784 (7th Cir. 2004) ("Any examples of allegedly discriminatory treatment by coworkers is wholly irrelevant to the mosaic, as [Carter's] coworkers had nothing to do with the decision to terminate his employment."); *Dandy v. United Parcel Service, Inc*. 388 F.3d 263, 272 (7th Cir. 2004) ("Racial epithets or stray remarks maybe direct or circumstantial evidence of intentional discrimination if they are sufficiently connected to the employment decision, i.e.,

made by the decisionmaker, or those who influence the decisionmaker, are made close in time to the adverse employment decision.").

For instance, Carter complains that Hadden, an African-American, female, team leader called him "boy" frequently.  While use of the term "boy" without any other modifiers can be evidence of racial discrimination, *Ash v. Tyson Foods, Inc.*, __ U.S. __, 126 S.Ct. 1195, 1197-98 (2006), Carter's evidence misses its legal mark.  Carter does not proffer evidence showing that any Citizens manager or supervisor who was responsible for the actions of which Carter complains called him "boy" in relation to any particular action against him.  Based on the record before the Court, Hadden was not responsible for and had no discernable role in any of the employment actions against Carter, nor were these admittedly offensive comments made to Carter contemporaneous to any employment action against him.  Thus, this evidence is not material and offers no assistance to Carter in overcoming Citizens' motion.  *See Venturelli v. ARC Comm. Servs., Inc.*, 350 F.3d 592, 602 (7th Cir. 2003) ("For ... a statement to be sufficient circumstantial evidence under the direct method, the remark in question must be 'directly related to the employment decision') (*quoting Gorence v. Eagle Food Centers, Inc.*, 242 F.3d 759, 762 (7th Cir. 2001)).

Carter further directs the Court's attention to Clawson-Bucksot's notation of "Tommy" at the top of his interview sheet.  However, this notation does not muster any racially inappropriate connotation against the canvas of this case.  Carter was the lone candidate of three interviewed by Clawson-Bucksot that obtained an offer from Citizens.  Clawson-Bucksot even scored Carter higher than one of the other female candidates.  [Razika Aff., Ex. A.]  This evidence undercuts Carter's theory that Clawson-Bucksot intentionally scored him low due to any impermissible

factor.  Without more, Clawson-Bucksot's notation of "Tommy" is not a material fact that sustains his prima facie case of discrimination or retaliation under the direct method.[10]

**B.     Carter fails to show discrimination or retaliation indirectly.**

In the absence of any direct or circumstantial evidence, the indirect method -- which applies the familiar *McDonnell Douglas* framework to create a presumption of discrimination or retaliation -- is the only tool left by which Carter may labor to preserve his claims.  *Rhodes v. Illinois Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (*citing Adams,* 324 F.3d at 939).  To make a prima facie showing of discrimination or retaliation and thus thwart Citizens' motion, Carter must show that: (1) he is a member of a protected class (or engaged in a protected activity, i.e. filing a charge of discrimination); (2) he is qualified for the position sought or, if already employed, has met Citizens' legitimate work expectations; (3) Citizens took an adverse employment action against him; and (4) Citizens treated similarly situated employees outside of the protected class (or who did not complain) more favorably.  *Davis*, 368 F.3d at 784, 788.  If Carter satisfies these prima facie elements of intentional discrimination or retaliation, the burden shifts[11] to Citizens to provide a nondiscriminatory reason for the employment action.  *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000).  If Citizens articulates a

---

[10] The other incidents of which Carter complains, including but not limited to Claffey's statements during training and with respect Citizens' disciplinary action, the field collector incident, comments regarding his attire, and the FMLA documentation phone call which Carter found to be harassing, suffer from the same deficiencies.  These facts simply have no link to any adverse action complained of by Carter.  *See Gorence*, 242 F.3d at 762 ("bigotry per se, is not actionable...there must be a real link between the bigotry and an adverse employment action.").

[11] Though the Court refers to Carter's burden to "show," "establish," or "demonstrate" prima facie cases or pretext, it recognizes that to survive summary judgment, Carter must only "show," "establish," or "demonstrate" that there remains a genuine issue of material fact.

nondiscriminatory reason, Carter must show that the articulated nondiscriminatory reason is pretext. *Id.*

### 1.     Prima facie case of sex discrimination.

In instances where men claim that an employer has discriminated against them on the basis of their sex or gender, the pliable *McDonnell Douglas* necessarily bends. *Mills v. Health Care Service Corp.*, 171 F.3d 450, 455-57 (7th Cir. 1999). Instead of showing that he was a member of the protected class, Carter must first demonstrate "background circumstances which give rise to an inference of discrimination." *Id.* at 457. He may do so by showing circumstances that "support an inference that [Citizens] is one of those unusual employers who discriminates against the majority..." *Id.* at 455.

Citizens contends that Carter lacks any evidence to support the requisite "background circumstances" for his reverse discrimination claims. [Docket No. 54, p. 28.] The Court agrees. Citizens' decision to offer him a part-time instead of full-time position is the only employment action for which Carter makes any attempt to show background circumstances. With respect to that claim, Carter only speculates that Cable's alleged sexual orientation somehow casts an imprimatur of gender-based discrimination on the hiring process.[12]

---

[12] Carter's evidence regarding Cable's sexual orientation is second hand and not admissible. Carter has only speculation by a coworker and hearsay testimony from a former supervisor -- both terminated by Citizens -- that Cable's sexual orientation impermissibly disadvantaged his opportunity for a full-time position. It is well settled that "discrimination law would be unmanageable if disgruntled employees could defeat summary judgment by . . . speculating about the defendant's motives." *Visser v. Packer Engineering Associates*, 924 F.2d 655, 659 (7th Cir. 1991). Additionally, Carter's logic is fatally flawed. Evidence of Cable's sexual orientation alone does not forecast her propensity to discriminate against men any more than evidence of a male supervisor's heterosexuality accurately predicts his inclination to discriminate against male employees.

Carter also points to Cable's statement that no external candidates were being hired into full-time positions.  Construing this statement in a light most favorable to Carter, and even assuming *arguendo* that Cable is a lesbian, Carter's evidence is ineffective for several reasons. Carter does not proffer any evidence from which the Court may infer that a full-time position was available at the time Cable made this statement.  At the time Cable called Carter, she had already offered the only available full-time positions to three individuals who benefited from higher composite scores -- not gender.  Equally telling, Cable did not interview Carter nor does Carter attack the method by which Citizens calculated composite scores.[13]

To the contrary, the evidence shows that Citizens' hiring of men was proportionate -- and possibly favorable -- to its male candidate pool.  At the time of Carter's hiring, only eleven percent of Citizens' applicant pool was male, but Citizens' scoring process resulted in a 20% male hire rate.  [Razika Aff. ¶ 9.]  Within three months of being offered the part-time position, Citizens placed Carter in a full-time position without requiring him to re-interview.  Simply, Carter makes no attempt to offer any admissible evidence giving rise to an inference that Citizens is "one of those unusual employers" that discriminates against men.  Without satisfying this prong, Carter cannot make a prima-facie case of gender discrimination, and the Magistrate Judge recommends that summary judgment be entered in Citizens' favor against Carter's gender

---

[13] Carter leans heavily on Cockrell's testimony regarding Carter's interview scores and her recollection that the interviewers identified Carter as a full-time candidate.  Giving Carter the full benefit of the doubt, this evidence does not meet the threshold of background circumstances because the undisputed evidence shows that Carter did not have the highest *composite* score and Citizens' hiring needs fluctuated during the interview process.

discrimination claims.[14]

### 2. Prima facie case of indirect race discrimination or retaliation.

The only agreement among the parties is that Carter -- an African American -- meets the first prong of the *McDonnell Douglas* test for race discrimination or retaliation. Citizens concedes that Carter's termination was a materially adverse job action but disputes that any of the other employment actions on Carter's lengthy laundry list of complaints regarding race discrimination rise to the level of materially adverse. Citizens additionally contends that Carter cannot show that he was meeting its legitimate expectations or that Citizens treated any other similarly situated white or non-complaining CSRs preferentially.

An adverse job action for the purpose of discrimination under § 2000 e-2(a) "'. . . must materially alter the terms and conditions of employment.'" *Whittaker v. Northern Ill. University*, 424 F.3d 640, 648 (7th Cir. 2005) (*quoting Stutler v. Ill. Dept. of Corr.*, 263 F.3d 698, 703 (7th Cir. 2001)). As recognized by Citizens, a material alteration of the terms and conditions of employment can transcend the purely economic. Non-economic actions that have immediate ramifications on promotions, transfers, or advantageous increases in job duties can be materially adverse. *Id*. at 648. In the context of retaliation under § 2000e-3(a), an employer's action is materially adverse if it dissuades a reasonable person from making or supporting a charge of discrimination. *Washington v. Ill. Dept. of Rev.*, 420 F.3d 658, 662 (7th Cir. 2005).

---

[14] As demonstrated in other sections of this Entry, Carter's prima facie showing of gender discrimination is likely doomed in other respects as well. Namely, Carter cannot identify any female, non-complaining CSR who is similarly situated and who Citizens treated more favorably. Even if he could, his claim would still fail due to his inability to show that Citizens' reasons for its adverse actions are pretext for gender discrimination.

Citizens' failure to initially hire Carter full-time, the last chance disciplinary action, and Carter's termination are the only actions complained of by Carter that meet even the broader construction of materially adverse.  None of the other actions detailed by Carter would dissuade a reasonable person from making or supporting a charge of discrimination,[15] nor did they have any tangible effect on the terms and conditions of his employment.  With respect to Carter's claim that he was not promoted, Carter proffers no evidence that he applied for any open positions for which a lesser qualified, white or non-complaining individual was selected or that the position remained open after his application.[16]  He does not specify, much less present, evidence of any undesirable assignments.  Any other comments or "harassment" noted by Carter, similar to Hadden's comments, amount to no more than stray remarks that are not actionable. *See Cowan v. Glenbrook Security Services, Inc*., 123 F.3d 438, 444 (7th Cir. 1997) ("stray remarks in the work place, while perhaps probative of [discrimination or retaliation], ... cannot justify requiring the employer to prove that its hiring or firing or promotion decisions were based on legitimate criteria.") (internal citation omitted).

Carter also makes passing reference to claims that Citizens discriminated against him when it prolonged his period of "mentoring" after his initial hire and when it denied him training

---

[15] In fact, Carter continued to complain and file charges of discrimination throughout his employment with Citizens.

[16] Carter applied for two posted positions between April and May 2003 that would have been a promotion for him but Citizens withdrew those positions without filling them.  [Razika Aff. ¶ 21.]  Carter accepted a full-time position in May 2003.  Carter also requested that Citizens place him in a "Community Resources Liaison" position [Carter Dep. p. 155, Ex. 11] but no such position existed.  [Razika Aff. ¶ 22.]  Even if one had been open, Carter lacked the requisite skills for such a position and was not qualified to be a manager.  [Razika Aff. ¶ 22, Carter Dep. p. 155.]

for cashier, interviewer, and receptionist.  [Docket No. 62, pp. 15, 19.]  What Carter fails to do is link these incidents to any impaired ability to perform his job or hindrance to promotions or other forms of advancement.  Indeed, the undisputed record reveals that Citizens placed Carter in a full-time position within three months of his initial hire, promoted him within the first year, and offered him training that would have resulted in another promotion.  Carter does not persuade this Court that these actions would deter a reasonable person from complaining about discrimination.  Thus, any prolonged mentoring or incidental denial of training does not rise to an actionable level.  *See Rhodes v. Illinois Dept. of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004) (mere temporary inconveniences are not materially adverse).

Carter's claims that Citizens' failure to hire him full-time, his last chance disciplinary action, and his termination were motivated by racial animus, while meeting the threshold of materially adverse, enjoy mixed results on the remaining prongs.  Concerning Citizens' full-time hiring decision, Carter was qualified for the full-time position and similarly situated to the Caucasian candidate who was offered a full-time position.  Thus, Carter has satisfied his prima facie showing with respect to his failure to hire claim, and the Court must determine whether Citizens' reason for hiring the Caucasian candidate over Carter was legitimate and non pretextual.

Carter's prima facie showing that Citizens' last chance disciplinary action and termination were racially motivated founder on the remaining prongs.  Carter essentially concedes that he was not performing his job satisfactorily at the time he was placed on a last

chance agreement and subsequently terminated.[17]  [Docket No. 63, pp. 27-29.]  His argument, to

the extent a cogent argument can be identified, boils down to a claim that Citizens applied its

legitimate employment expectations in a discriminatory manner.[18]  Thus, the second and fourth

prongs of the *McDonnell Douglas* merge into one and the Court need only assess whether Carter

can show that Citizens disciplined him more harshly than any similarly situated non-African

American, or non-complaining CSR.  *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir.

2002); *Curry v. Menard, Inc.* 270 F.3d 473, 477-78 (7th Cir. 2001).

Similarly situated means directly comparable in all material respects.  *Bio v. Federal

Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005) (*quoting Patterson v. Avery Dennison Corp.*,

281 F.3d 676, 680 (7th Cir. 2002)).  Specifically, Carter's comparators must be substantially

similar in terms of performance, qualifications, and conduct.  *Radue v. Kimberly-Clark*, 219 F.3d

612, 617 (7th Cir. 2002) (internal citations omitted).  Carter must show that he and some other

Caucasian or non-complaining CSR who was not placed on a last chance agreement or

---

[17] At the same time, Carter presents two pieces of information in an attempt to show that he was generally meeting Citizens' employment standards: (1) his own testimony that he received commendations for good customer service at some unidentified point before 2005; and (2) the decision of an unemployment insurance appeals administrative law judge, which found Citizens did not carry its burden of establishing it discharged Carter for just cause pursuant to Ind. Code § 22-4-15-1(d).  The Court may not properly consider either piece of evidence.  *See Johal v. Little Lady Fingers, Inc.,* 434 F.3d 943, 946 (7th Cir. 2006) (positive performance review received within six months of termination was insufficient evidence that employee was meeting company's legitimate expectations at time it terminated her employment); *McClendon v. Indiana Sugars, Inc.* 108 F.3d 789, 798 (7th Cir. 1997) (unemployment insurance determination held inadmissible in employment retaliation case where ultimate issue and allocation of burden before the state administrative proceeding was significantly different).

[18] Even if the Court were to assess whether Carter was meeting Citizens' performance expectations, his propensity to draw external complaints -- the first two of which predate his first EEOC charge -- seriously undermines his claims that he was meeting Citizens' performance standards or that Citizens' actions were discriminatory or retaliatory.

subsequently terminated dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without any differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.  *Id.* at 618.

Carter offers Derrick Schaefer, Ta-TashaWarfield, Antoinette Hood, and Angie Moody as comparators.  He fails, however, to produce admissible evidence that any of these employees had the lengthy history of attendance problems coupled with a history of external customer complaints, or were ever on a last chance agreement after generating customer complaints. Carter alleges only that these employees were either tardy and not disciplined or terminated, or in the case of Hood, made an inappropriate statement after a phone call and was not terminated. Carter does not even come close to demonstrating that these employees were accused of customer interactions similar in number or nature to those involving Carter that generated customer complaints.[19]  Thus, these employees are not similarly situated, and the Magistrate Judge recommends that summary judgment be entered in Citizens' favor against Carter's claims that Citizens discriminated against him on the basis of his race or retaliated against him.[20]

---

[19] Notably, Hood was demoted from team leader to CSR after making an inappropriate statement that the customer was not privy to, but of which her co-workers complained, and placed on a performance improvement plan.  [Halsworth Aff. ¶ 5.]

[20] Assuming *arguendo* that Carter had made a prima facie showing of race discrimination or retaliation concerning his discipline and termination, Citizens would still prevail on summary judgment under the law and reasoning of the cases cited in subsection 3 because Carter essentially concedes that he was not performing his job satisfactorily at the time he was placed on a last chance agreement and subsequently terminated.  Therefore, Carter cannot expose Citizens' legitimate reasons for placing him on a last chance agreement or terminating his employment as pretext.

### 3.      Pretext.

To establish that Citizens' reason for initially hiring Carter part-time is a pretext for race discrimination, Carter must expose Citizens' articulated reason for its actions as: (1) baseless in fact; (2) not actually motivating its decision; or (3) insufficient to motivate its decision.  *Grayson v. O'Neill*, 308 F.3d 808, 820 (7th Cir. 2002); *Velasco v. Illinois Dept. of Human Serv.*, 246 F.3d 1010, 1017 (7th Cir. 2001).  Pretext does not mean a mistake, but rather, a phony or dishonest reason.  *Logan v. Kautex Textron N. Am.*, 259 F.3d 635, 640 (7th Cir. 2001); *Ballance v. Springfield*, 424 F.3d 614, 621 (7th Cir. 2005).  *See also Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000) (plaintiff must demonstrate that an employer's proffered explanation for an employment decision is a dishonest explanation, rather than merely an error).

Citizens contends that it hired Carter part-time and Moody full-time because Moody scored a greater composite score than Carter.  [Docket No. 74, p. 34.]  Carter responds that this is not the "real reason as stated" but does not produce any evidence demonstrating that Citizens' reason was phony, or not based in fact.  The record evidence overwhelmingly supports Citizens' assertions that it filled three full-time positions in order of composite scoring, and Carter's composite score was lower than any of the individuals who obtained full-time positions.  The record lacks evidence discrediting the stated reason for Citizens' hiring decisions, and Carter is unable to establish that Citizens' reason was a dishonest mask for discriminatory animus.  Indeed, the fact that he was placed in a full-time position within months of his hiring further undercuts any inference of discriminatory animus.  Consequently, the Magistrate Judge recommends that summary judgment be entered on Citizens' motion for summary judgment against Carter's claim that Citizens failed to initially hire him full time because of his race.

**V.      Conclusion.**

For the reasons stated above, the Magistrate Judge recommends that Citizens' motion for summary judgment [Docket No. 47] be GRANTED in its entirety and that this action be dismissed with prejudice.

Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1), and failure to file timely objections within the ten days after service shall constitute a waiver of subsequent review absent a showing of good cause for such failure.


Dated:      04/03/2006

_____

Tim A. Baker
United States Magistrate Judge
Southern District of Indiana




Copies to:

Wayne O. Adams III
ICE MILLER LLP
wayne.adams@icemiller.com

Julie M. Conrad
ICE MILLER LLP
conrad@icemiller.com

Stacey Michelle Davis
staceymdavislaw@aol.com

Margaret Dewey Wielenberg
ICE MILLER LLP
margaret.wielenberg@icemiller.com